Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: PETER DAWIDZIK

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER DAWIDZIK, on behalf of himself and all similarly situated persons,<br><br>                    Plaintiff,<br><br>v.<br><br>GENERAL MOTORS COMPANY, a Delaware corporation; GENERAL MOTORS HOLDINGS LLC, a Delaware limited liability company,<br><br>                    Defendants. | Case No:<br><br>**COMPLAINT**<br><br>1. Cal. Penal Code § 638.51<br>2. Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>**<u>CLASS ACTION</u>** |

1

CLASS ACTION COMPLAINT

## I.    NATURE OF THE ACTION

1.    Defendants GENERAL MOTORS COMPANY, a Delaware corporation and GENERAL MOTORS HOLDINGS LLC, a Delaware limited liability company (collectively referred to herein as "Defendant" or "GM") own and operate a website, www.cadillac.com (the "Website").

2.    This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3.    Plaintiff PETER DAWIDZIK files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5.    When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.    When users visit the Website, Defendant causes tracking technologies to be installed, executed, embedded, or injected in visitors' browsers. These include, but are not limited to, the following:

- Google Ads / DoubleClick / Tag Manager Tracker
- Facebook Pixel Tracker
- Bing / Microsoft Ads Tracker
- LinkedIn Tracker
- Snapchat Tracker
- Pinterest Tracker

CLASS ACTION COMPLAINT

- Adobe / Demdex Tracker

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8. The Trackers are operated by distinct third parties: Google LLC (Google Ads / DoubleClick / Tag Manager Tracker); Meta Platforms, Inc. (Facebook Pixel Tracker); Microsoft Corporation (Bing / Microsoft Ads Tracker); LinkedIn Corporation (LinkedIn Tracker); Snap Inc. (Snapchat Tracker); Pinterest, Inc. (Pinterest Tracker); Adobe Inc. (Adobe / Demdex Tracker) (collectively the "Third Parties"). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9. Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using

CLASS ACTION COMPLAINT

the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices.

13.    Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

14.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    PARTIES

15.    Plaintiff PETER DAWIDZIK ("Plaintiff") is a California citizen residing in San Bernardino County and has an intent to remain there.  Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16.    Defendant GENERAL MOTORS COMPANY is a Delaware corporation that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

17.    Defendant GENERAL MOTORS HOLDINGS LLC is a Delaware limited liability company that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    GENERAL MOTORS COMPANY and GENERAL MOTORS HOLDINGS, LLC are referred to collectively herein as "Defendant" or "GM."

19.    GENERAL MOTORS COMPANY is a leading global automotive manufacturing company that owns and operates the luxury vehicle division Cadillac through its subsidiary General Motors Holdings LLC. The company maintains Cadillac's dominant online presence in the United States and operates Cadillac's primary consumer platform at www.cadillac.com.  GM enables users to browse and

4

CLASS ACTION COMPLAINT

purchase luxury vehicles, SUVs, and electric vehicles from the Cadillac brand through authorized Cadillac dealerships across the country.

20. Cadillac functions as the luxury consumer-facing brand within GM's broader automotive ecosystem, operating as a division of GENERAL MOTORS HOLDINGS LLC. While GM supports a variety of dealer tools and services through its digital platforms, the Cadillac.com platform is directly responsible for facilitating luxury vehicle sales transactions, processing customer financing through Cadillac Financial, and managing communications between Cadillac dealers and consumers. In the course of operating Cadillac's online automotive marketplace, GM collects and processes significant volumes of user data through the Website for purposes that include transaction fulfillment, behavioral profiling, and digital advertising.

21. The Website serves as Cadillac's primary digital storefront under GM's ownership.  It allows users to explore Cadillac vehicle listings, save favorites, manage Cadillac owner accounts, and complete luxury vehicle purchases through the Cadillac dealer network. In addition to these retail functions, the Website also operates as a behavioral tracking and advertising platform controlled by GM.

22. Through the deployment of third-party tracking technologies including advertising pixels, event tracking scripts, behavioral monitoring tools, and data brokering integrations GM collects granular data about user interactions with the Website. These data practices form a core component of GM's performance marketing, ad-targeting, and audience monetization strategy for the Cadillac brand.

### III.   JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

/ / /

CLASS ACTION COMPLAINT

24. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California including through the Website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

25. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

26. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

27. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

28. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

/ / /

6

CLASS ACTION COMPLAINT

29.     Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

30.     In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

31.     Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

32.     Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line— essentially capturing the user's outgoing information.

33.     Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line— capturing the incoming information.

34.     Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

35.     The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

7

36. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (See *Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).)

37. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

### 2. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"*

38. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources including HTML, cascading style sheets (CSS), JavaScript files, and image assets used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. ***Figure 1*** below illustrates sample HTTP requests.

***Figure 1***



39. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data typically via HTTPS requests to the servers of third-party tracking

CLASS ACTION COMPLAINT

vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

40. The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered automatically during the page load and by user interactions with the Website. They are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

41. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used via external geolocation services to infer a user's general location, including state, city, and in some cases, ZIP code.

42. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

43. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

9

CLASS ACTION COMPLAINT

44.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

45.    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

46.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

47.    Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

48.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing

CLASS ACTION COMPLAINT

session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

49.     This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

50.     When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint, especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

51.     The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

52.     In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking

11

CLASS ACTION COMPLAINT

technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

53. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website. These services also leverage user data collected from other websites that include the same pen register and trap and trace devices operated by the Third Parties.

54. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.      *Plaintiff's And Class Members' Data Has Financial Value***

55. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

56. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

/ / /

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

CLASS ACTION COMPLAINT

57.    There is "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

58.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

59.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars.  Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

---

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

CLASS ACTION COMPLAINT

60.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

61.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

62.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

63.     By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles may include information such as which users viewed specific products, engaged with pages or interface elements, or demonstrated purchase intent. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. The behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to re-engage high-intent visitors, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

/ / /

---

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT

64.     Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

65.     IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction.  IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

66.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ / /

CLASS ACTION COMPLAINT

**6.**     *The Trackers Function Together to Achieve Targeted Objectives*

67.     When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows GM to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

68.     On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem, and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

69.     On the Website, a coordinated network of third-party trackers is deployed to facilitate identity resolution, targeted advertising, and data monetization. This infrastructure includes both trackers embedded directly in the page's HTML and others deployed through JavaScript-based execution during runtime. Google Ads / DoubleClick, the Facebook Pixel Tracker, Bing / Microsoft Ads Tracker, and LinkedIn Tracker are embedded in the initial page source and activate immediately upon page load. Additional trackers including Snapchat Tracker, Pinterest Tracker, and Adobe / Demdex Tracker are dynamically injected using JavaScript functions that execute during or shortly after the initial page load process. These technologies operate in tandem to collect and transmit user interaction data in real time, supporting downstream advertising, profiling, and data-sharing operations.

70.     Identity resolution on Cadillac.com is primarily facilitated through the interplay of the Facebook Pixel Tracker, LinkedIn Tracker, and Adobe / Demdex Tracker. The Facebook Pixel Tracker identifies users by linking on-site behavior to

CLASS ACTION COMPLAINT

existing Facebook cookies and logged-in sessions, enabling the correlation of browsing activity with social media identities. The LinkedIn Tracker collects device-level information and leverages both browser fingerprinting and cookie-based identifiers to associate user activity with persistent professional profiles on the LinkedIn platform. The Adobe / Demdex Tracker contributes to identity resolution through behavioral segmentation and targeting logic designed to match users with audience categories in real time. These combined technologies enable GM to de-anonymize users over time, correlate behaviors with known identities, and build detailed demographic and behavioral profiles.

71.    Once identity signals are gathered, targeted advertising and data monetization are executed through platforms such as Google Ads / DoubleClick, Snapchat Tracker, and Bing / Microsoft Ads. These entities participate in real-time bidding (RTB) and programmatic advertising markets, enabling GM to auction access to users based on behavioral and identity-linked data. Google Ads / DoubleClick delivers performance-based advertising by leveraging browsing behavior, conversion history, and demographic profiles to serve targeted creatives. The Snapchat Tracker acts as a social media advertising platform, facilitating cross-channel ad buying and real-time audience targeting. Bing / Microsoft Ads uses conversion tracking and event-level data to enable remarketing and audience segmentation across Microsoft's advertising ecosystem. Together, these trackers convert user interactions into marketable audience segments, driving measurable advertising outcomes and monetization for GM.

72.    GM shares User Information with third-party advertising platforms, including DoubleClick. These platforms operate real-time bidding systems that auction ad space to the highest bidder using behavioral data collected from users during their visit to the Website. When a user loads the Website, data is immediately transmitted to DoubleClick and related ad services without any action or consent from the user. This includes the user's internet protocol address, browser type, device information, and the URL of the page visited. These identifiers enable advertisers to track users across

17

CLASS ACTION COMPLAINT

websites, build behavioral profiles, and deliver personalized advertising in real time. Network requests to DoubleClick's activity and view through conversion endpoints demonstrate GM's participation in an integrated advertising architecture that supports real-time ad placement. This system enables advertisers to bid for ad impressions based on user characteristics, allowing GM to increase ad revenue by monetizing user attention. These exchanges serve no functional purpose for the user; their sole role is to maximize GM's advertising returns. By embedding tracking requests that operate silently and immediately on page load, GM treats personal data as a commodity for its own profit.

73. GM's data privacy violations are not isolated incidents but part of a documented pattern of unlawful consumer data collection and monetization practices. On January 16, 2025, the Federal Trade Commission imposed a five-year ban on GM's ability to sell driver data to consumer reporting agencies after finding that GM systematically collected precise geolocation and driving behavior data from approximately 9 million vehicles through its OnStar Smart Driver program without obtaining proper consumer consent. This recent regulatory action demonstrates GM's disregard for consumer privacy rights and establishes a clear precedent of the company's willingness to prioritize data monetization over privacy rights.

74. GM is presently defending a broad suite of privacy lawsuits, including a Georgia MDL of over 32 class actions and state AG suits in Texas, Arkansas, Nebraska, and Indiana that allege the company deceptively enrolled drivers in OnStar's Smart Driver program, collected precise location and behavioral data from millions of vehicles without consent, and sold it to data brokers for insurance scoring. The recent regulatory action and the ongoing civil litigation highlight GM's disregard for consumer privacy rights and establishes a clear precedent of the company's willingness to prioritize data monetization over privacy rights.

/ / /

CLASS ACTION COMPLAINT

## V.   SPECIFIC ALLEGATIONS

*1.   Google Ads / DoubleClick / Tag Manager Tracker*

75.   The Google Ads / DoubleClick / Tag Manager Tracker (collectively the "Google Tracker") is a digital advertising, behavioral tracking, and data brokering technology operated by Google LLC. It is designed to deliver display advertisements, measure engagement, and support real-time bidding on programmatic ad exchanges. The Google Tracker enables Google and its advertising clients to collect detailed user interaction data and optimize ad delivery across a vast network of third-party websites.

76.   When implemented on the Website, the Google Tracker collects a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and in-page activity data such as page views and navigation events. It also captures technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers placed via cookies or pixel fires that allow Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles. The Google Tracker also transmits conversion tracking signals and remarketing data, enabling Google to associate Website interactions with ad conversion events and to retarget users across its advertising ecosystem.

77.   The Google Tracker facilitates monitoring of user activity on the Website, including the capture of pageview events and other engagement signals that can be used to track user progression through various transactional flows. These interaction signals are transmitted to Google's ad infrastructure to facilitate targeted advertising, audience retargeting, and conversion tracking. The Google Tracker executes via JavaScript calls to domains automatically upon page load without requiring any action by the user.

78.   The following figures [*Figure 2* and *Figure 3* and *Figure 4*] provide technical evidence of the Google Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts

CLASS ACTION COMPLAINT

embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

*Figure 2*



/ / /

/ / /

/ / /

/ / /

20

CLASS ACTION COMPLAINT

*Figure 3*



*Figure 4*



79.     Defendant surreptitiously installed, executed, embedded or injected the Google Tracker onto users' browsers by embedding tracking scripts in the Website's page source and by dynamically injecting additional JavaScript tracking code during

21

runtime. When a user visits the Website, their browser automatically executes this code, which initiates outbound network requests to Google's advertising servers and transmits metadata including IP address, page URL, referrer information, device details, behavioral identifiers, and conversion tracking parameters as part of a third-party ad targeting, profiling, and data brokering system.

80.    The Google Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

81.    The Google Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

82.    The Google Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures outgoing signaling data such as URLs visited, timestamps, and referrer headers and also processes incoming metadata such as ad impressions and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader advertising profiles.

83.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

84.    Consequently, the Google Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**2.      *The Facebook Pixel Tracker***

85.    The Facebook Pixel Tracker is a behavioral tracking script implemented through Meta's Pixel technology, typically delivered via domains such as connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Pixel Tracker is injected through tag management infrastructure. Once loaded, it initiates

CLASS ACTION COMPLAINT

background communication with Meta's servers and enables real-time tracking of user activity.

86.    On the Website's homepage, the Facebook Pixel Tracker activates automatically upon page load and begins capturing behavioral data in real time. It records interaction signals such as page views and other engagement events without requiring any user action. The Facebook Pixel Tracker actively detects and collects additional user interaction, including click-based events and scrolling behavior. These signals are transmitted to Meta's servers and associated with the user's Facebook or Instagram profile, even if the user never directly interacts with any Meta service while on the Website.

87.    The data collected by the Facebook Pixel Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Facebook Pixel Tracker can tie Website behavior to the user's unique Meta ID. Even if not logged in, Meta can assign a persistent identifier using cookies, browser fingerprinting, or pixel fire data. This enables the creation of robust cross-site behavioral profiles based on a user's activity on the Website.

88.    The Facebook Pixel Tracker also serves Defendant's goal of targeted advertising by enabling the creation of "Custom Audiences," groups of users who have taken specific actions on the Website, such as browsing listings, viewing product pages, or beginning a checkout process. Defendant can then use Meta's Ads Manager to re-target those users across Facebook and Instagram, or to generate "Lookalike Audiences" that mirror the behavioral patterns of existing visitors. These mechanisms allow Defendant to efficiently deliver marketing content to users most likely to engage or convert.

89.    The Facebook Pixel Tracker contributes to Defendant's data monetization strategy by turning behavioral insights into measurable advertising ROI. The Facebook Pixel Tracker generates real-time analytics regarding user behavior,

CLASS ACTION COMPLAINT

campaign performance, and conversion attribution, which Meta then delivers to Defendant through its Ads infrastructure. This closed-loop feedback system connects on-site engagement with off-site ad delivery, allowing Defendant to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Facebook Pixel Tracker functions as a core part of Defendant's commercial surveillance infrastructure.

90.    The following figures [*Figure 5*, *Figure 6* and *Figure 7*] provide technical evidence of the Facebook Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

*Figure 5*



/ / /

CLASS ACTION COMPLAINT

*Figure 6*



*Figure 7*



/ / /

/ / /

25

CLASS ACTION COMPLAINT

91.    Defendant surreptitiously installed, executed, embedded, or injected the Facebook Pixel Tracker onto users' browsers by dynamically injecting Meta's JavaScript pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

92.    The Facebook Pixel Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

93.    The Facebook Pixel Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

94.    The Facebook Pixel Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata to Meta's servers as soon as the page loads, without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the Website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

95.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Pixel Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

96.    Consequently, the Facebook Pixel Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

CLASS ACTION COMPLAINT

### 3.    *The Bing / Microsoft Ads Tracker*

97.    The Bing / Microsoft Ads Tracker, typically delivered through the domain bat.bing.com, is part of the Microsoft Advertising platform (formerly Bing Ads). It is used to track user interactions on websites in order to attribute conversions, retarget visitors, and optimize advertising campaigns across Microsoft's search and display networks, including Bing, MSN, and LinkedIn.

98.    The Bing / Microsoft Ads Tracker is designed to silently collect a range of user data when a visitor lands on the Website. It gathers device and browser metadata, IP address, estimated geolocation, referrer URLs, and viewed pages. It is also designed to capture click events and conversion actions such as form submissions or account sign-ups on the Website. Through the use of cookies and unique identifiers, the Bing / Microsoft Ads Tracker can track users across sessions and websites to build behavioral profiles and deliver targeted advertising.

99.    The following figures [*Figure 8*, *Figure 9* and *Figure 10*] provide technical evidence of the Bing / Microsoft Ads Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

/ / /

/ / /

/ / /

27

CLASS ACTION COMPLAINT

*Figure 8*



*Figure 9*



/ / /

CLASS ACTION COMPLAINT

**Figure 10**

100.    Defendant surreptitiously installed, executed, and embedded the Bing / Microsoft Ads Tracker onto users' browsers by including Microsoft's JavaScript tracking code directly in the Website's source code. When a user visits the Website, their browser executes this code, which triggers outbound requests to Microsoft's servers and transmits metadata including the user's IP address, page URL, referrer, and session-specific identifiers.

101.    The Bing / Microsoft Ads Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

102.    The Bing / Microsoft Ads Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

103.    The Bing / Microsoft Ads Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers - all of which qualify as routing or signaling information under CIPA.

/ / /

CLASS ACTION COMPLAINT

104.   The Bing / Microsoft Ads Tracker collects real-time signaling and routing information from the user's device without direct interaction. It acts as a pen register by capturing outbound metadata such as page visits, click events, and form submissions, and as a trap and trace device by receiving inbound responses like ad content and tracking pixels. These communications occur passively, enabling Microsoft to assign user identifiers, build behavior profiles, and facilitate personalized advertising, all without the user's knowledge or consent.

105.   Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Bing / Microsoft Ads Tracker on Plaintiff's and Class Members' browser or to collect or share data with Microsoft.

106.   Consequently, the Bing / Microsoft Ads Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 4.    The LinkedIn Tracker

107.   The LinkedIn Tracker, typically delivered via the domain px.ads.linkedin.com, is a third-party behavioral tracking pixel operated by LinkedIn Corporation. On the Website, this tracker is dynamically injected into users' browsers upon visiting the site. The tracker establishes a connection to LinkedIn's servers and collects various data points, including IP address, device type, browser version, geolocation, and unique cookie or device identifiers. These transmissions occur automatically and without any user interaction, demonstrating that user activity is being monitored in real time for purposes of behavioral profiling, identity resolution, and targeted advertising.

108.   Once activated, the LinkedIn Tracker plays a central role in identity resolution by assigning persistent identifiers that can be recognized across other websites, platforms, and devices within the LinkedIn Marketing Solutions network. Techniques such as cookie syncing, hashed email matching, and probabilistic cross-

CLASS ACTION COMPLAINT

device identification enable LinkedIn to correlate behavioral data gathered on the Website with broader user profiles throughout its ecosystem. These mechanisms allow LinkedIn to assemble a cohesive view of individual online behaviors, even if the user is not logged in during the interaction.

109. The LinkedIn Tracker facilitates targeted advertising by enabling Defendant to re-engage users who have previously visited the Website, interacted with content, or initiated transactions. This includes the retargeting of individuals with personalized ads across LinkedIn and its partner network. LinkedIn's audience analytics and lookalike modeling empower Defendant to identify behavioral traits of existing site visitors and build new audience segments comprised of users with similar interests or attributes. These capabilities enhance Defendant's ability to optimize its marketing campaigns.

110. On the Website, the LinkedIn Tracker converts user interactions into revenue-generating behavioral data by capturing real-time engagement signals and transforming them into actionable advertising segments. Through tracking users across multiple touchpoints and aligning these signals with audience categories, Defendant can access detailed analytics and fine-tune ad expenditures. The collected data feeds into LinkedIn's programmatic advertising system, where advertisers compete in real time to show targeted ads to high-value users based on behavioral signals collected from Defendant's site. In this way, the LinkedIn Tracker enables Defendant to monetize user engagement while supporting profiling, audience targeting, and real-time auction-based advertising.

111. The following figures [*Figure 11*, *Figure 12* and *Figure 13*] provide technical evidence of the LinkedIn Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and

31

behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

*Figure 11*



*Figure 12*



/ / /

CLASS ACTION COMPLAINT

**Figure 13**

112.    Defendant surreptitiously installed, executed, embedded, or injected The LinkedIn Tracker onto users' browsers by deploying JavaScript code that triggers communication with LinkedIn's tracking infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to The Trade Desk's servers and transmitting user metadata, including IP address, page URL, and unique identifiers. This transmission occurs silently and without any user action, allowing LinkedIn to capture data about user interactions on the Website in real time.

113.    The LinkedIn Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

114.    The LinkedIn Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device.  See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

115.    The LinkedIn Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers, all of which qualify as routing or signaling information under CIPA.

33

116. The user does not intentionally initiate any communication with LinkedIn; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, LinkedIn is able to silently intercept and log communication-related data generated during the user's interaction with the Website. In this way, the LinkedIn functions as a surveillance mechanism that captures third-party signaling information.

117. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the LinkedIn Tracker on Plaintiff's and Class Members' browser or to collect or share data with LinkedIn.

118. Consequently, The LinkedIn Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**5.      *The Snapchat Tracker***

119. The Snapchat Tracker, also known as the Snap Pixel, is a third-party behavioral tracking tool. When implemented on the Website, the Snapchat Tracker embeds scripts that monitor user behavior and session metadata. This tracker collects various data points such as page views, timestamps, IP addresses, device types, browser characteristics, and user interactions with on-site content. On the Website, the Snapchat Tracker was active during user sessions and initiated data collection immediately when the site loaded.

120. By capturing both behavioral and technical information, the Snapchat Tracker enables session analysis, audience profiling, and attribution tracking. It allows Defendant to correlate user interactions with demographic, interest-based, and behavioral attributes associated with Snapchat platform users. This capability supports segmentation, personalized marketing, and campaign optimization. The data collected by the Snapchat Tracker aids Defendant in identity resolution and user targeting, enhancing their ability to understand and engage specific user cohorts and to monetize

CLASS ACTION COMPLAINT

user data through tailored advertising and marketing strategies.

121.    The following figures [*Figure 14*, *Figure 15* and *Figure 16*] provide technical evidence of the Snapchat Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

*Figure 14*



///

///

///

35

CLASS ACTION COMPLAINT

*Figure 15*



*Figure 16*



122. Defendant surreptitiously installed, executed, or injected the Snapchat Tracker onto users' browsers by triggering Snapchat JavaScript tracking code during page load. When a user visits the Website, their browser executes the script, which transmits data about the user's interactions including the user's IP address, page URL,

36

and session metadata to Snapchat's servers. This transmission occurs automatically and silently, without the user's awareness or interaction.

123. The Snapchat Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

124. The Snapchat Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

125. The Snapchat Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

126. Snapchat engages in user tracking and behavioral profiling, without the user's awareness or consent, by collecting and processing granular session-level data on behalf of Defendant.

127. The persistent identifiers used by Snapchat allow it to track user behavior across sessions and contexts, enabling Defendant to build detailed user profiles and optimize marketing and engagement strategies without user awareness or consent.

128. The Snapchat Tracker initiates a connection to Snapchat's servers upon page load. This connection transmits routing and signaling metadata, including the user's IP address, user-agent string, full URL path, referrer header, and timestamp. These data points enable Snapchat to identify the source and destination of the communication and to process user session metadata for targeting and analytics purposes. Accordingly, the Snapchat Tracker functions as a pen register and/or trap and trace device and/or process.

129. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Snapchat Tracker or to collect or share data with Snapchat.

CLASS ACTION COMPLAINT

130. Consequently, the Defendant's secret installation of the Snapchat Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**6.      *The Pinterest Tracker***

131. The Pinterest Tracker, also known as the Pinterest Tag, is a session-level tracking and data collection tool operated by Pinterest, Inc. When deployed on the website, the Pinterest Tracker captures visitor metadata, including IP address, page URL, browser and device information, and session timing details. On the Website, the Pinterest Tracker was active during each user session and initiated communication with Pinterest's servers as soon as the site loaded, enabling Defendant to analyze user behavior and measure advertising attribution without the user's knowledge or active engagement.

132. The Pinterest Tracker enables session-level tracking by transmitting metadata to Pinterest's servers immediately upon page load. The data collected includes user-agent strings, timestamps, referrer headers, and unique identifiers, which can be used to analyze user activity and evaluate the effectiveness of advertising campaigns. Pinterest's tracking infrastructure enables Defendant to correlate this metadata with Pinterest-related engagement metrics for purposes such as attribution, audience profiling, and marketing optimization.

133. The following figures [*Figure 17*, *Figure 18* and *Figure 19*] provide technical evidence of the Pinterest Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

/ / /

CLASS ACTION COMPLAINT

*Figure 17*



*Figure 18*



/ / /

39

CLASS ACTION COMPLAINT

**Figure 19**

134. Defendant surreptitiously installed, executed, or injected the Pinterest Tracker onto users' browsers by deploying JavaScript tracking code that initiated outbound requests to Pinterest's servers. When a user visits the Website, the browser executes the Pinterest script, which collects user interaction metadata including the user's IP address, page URL, session details, and referrer and transmits it to Pinterest's servers in real time, without the user's awareness or consent.

135. The Pinterest Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

136. The Pinterest Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

137. The Pinterest Tracker captures non-content signaling information such as IP addresses, visited URLs, timestamps, and referrer data associated with electronic communications. These data points reveal routing and addressing details and allow Defendant and Pinterest to monitor user sessions for tracking and attribution purposes.

138. Pinterest engages in user tracking and profiling on behalf of Defendant

40

CLASS ACTION COMPLAINT

by processing session metadata and associating it with podcast-related marketing activities. The tracking occurs without any user interaction, knowledge, or consent and contributes to Defendant's behavioral profiling and advertising strategy.

139.   The Pinterest Tracker initiates a connection to Pinterest's infrastructure immediately upon page load. The transmission includes routing and signaling metadata such as IP address, user-agent, full URL, and timestamps, which qualify as pen register and trap and trace data under CIPA.

140.   Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Pinterest Tracker or to collect or share data with Pinterest.

141.   Consequently, the Defendant's secret installation of the Pinterest Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 7.    *The Adobe / Demdex Tracker*

142.   The Adobe / Demdex Tracker is a session-level tracking and data collection tool operated by Adobe, Inc. through its demdex.net domain. When deployed on a website, the Demdex Tracker captures visitor metadata such as IP address, page URL, browser and device characteristics, unique identifiers (including the demdex cookie), and session timing information. On the Website, the Demdex Tracker operated during each user session and initiated communication with Adobe's data collection servers as soon as the site loaded, enabling Defendant to analyze user behavior and measure attribution without the user's knowledge or direct engagement.

143.   The Demdex Tracker facilitates session-level tracking by transmitting metadata and behavioral data to Adobe Audience Manager's servers immediately upon page load. Information collected includes user-agent strings, timestamps, referrer headers, declared IDs, and unique user IDs assigned by Audience Manager, which are essential for visitor identification, segmentation, and modeling. Adobe's tracking

CLASS ACTION COMPLAINT

infrastructure allows Defendant to correlate this metadata with broader audience segmentation metrics for purposes such as attribution, profiling, marketing optimization, and targeted advertising.

144.   The following figures [*Figure 20*, *Figure 21* and *Figure 22*] provide technical evidence of the Adobe / Demdex Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source resulting in HTTP or DNS requests to external tracking domain and confirming the presence of advertising identifiers, of building data profiles, of the timing of tracker firing, and/or of the sharing of session Id's and behavioral information.  These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

*Figure 20*



/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

*Figure 21*



*Figure 22*



145. Defendant surreptitiously installed, executed, or injected the Adobe / Demdex Tracker onto users' browsers by deploying JavaScript tracking code that initiated outbound requests to Adobe's servers. When a user visits the Website, the browser executes the Podscribe script, which collects user interaction metadata

CLASS ACTION COMPLAINT

including the user's IP address, page URL, session details, and referrer and transmits it to Adobe's servers in real time, without the user's awareness or consent.

146. The Adobe / Demdex Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

147. The Adobe / Demdex Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

148. The Adobe / Demdex Tracker captures non-content signaling information such as IP addresses, visited URLs, timestamps, and referrer data associated with electronic communications. These data points reveal routing and addressing details and allow Defendant and Pinterest to monitor user sessions for tracking and attribution purposes.

149. Adobe engages in user tracking and profiling on behalf of Defendant by processing session metadata and associating it with podcast-related marketing activities. The tracking occurs without any user interaction, knowledge, or consent and contributes to Defendant's behavioral profiling and advertising strategy.

150. The Adobe / Demdex Tracker initiates a connection to Adobe's infrastructure immediately upon page load. The transmission includes routing and signaling metadata such as IP address, user-agent, full URL, and timestamps, which qualify as pen register and trap and trace data under CIPA.

151. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Adobe / Demdex Tracker or to collect or share data with Adobe.

152. Consequently, the Defendant's secret installation of the Adobe / Demdex Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

/ / /

CLASS ACTION COMPLAINT

## VI.    CLASS ALLEGATIONS

153.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

154.    **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more.  The exact identities of Class Members can be ascertained by the records maintained by Defendant.

155.    **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates CIPA; and
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice.

CLASS ACTION COMPLAINT

156. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

157. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

158. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

159. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

160. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

161. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

162. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory

46

CLASS ACTION COMPLAINT

penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    SECOND CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

163.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

164.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

165.    This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

166.    Defendant has engaged in unlawful business practices by:

(a) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(b) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice.  Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc*., 101 F.4th 706 (9th Cir. 2025) (en banc).

167.    Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

168.    The Defendant's practices are contrary to public policy supporting

consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

169.   Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

170.   As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

171.   Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates CIPA and Business

CLASS ACTION COMPLAINT

& Professions Code § 17200;

3.      An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

4.      An order enjoining Defendant's conduct as alleged herein;

5.      Statutory damages pursuant to CIPA;

6.      Prejudgment interest;

7.      Reasonable attorney's fees and costs; and

8.      All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated:   August 8, 2025            **NATHAN & ASSOCIATES, APC**


By:  /s/ Reuben D. Nathan
        Reuben D. Nathan, Esq.
        Attorneys for Plaintiff

49

CLASS ACTION COMPLAINT